UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                Case No. 14-20417

v.                                       Honorable Victoria A. Roberts
                                          Magistrate Judge David R. Grand

D-8    JOSEPH MELCHER,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT MELCHER'S MOTION TO SUPPRESS [141]

**I.**     **PROCEDURAL HISTORY**

Nine defendants, including Joseph Melcher ("Melcher"), were indicted by a grand jury on July 16, 2014, and charged with Conspiracy to Commit an Illegal Gambling Business, contrary to 18 U.S.C. §371, and Conducting an Illegal Gambling Business, contrary to 18 U.S.C. §1955. (Doc. #1). On February 26, 2015, Melcher filed a motion to suppress statements and admissions he made during contact with FBI agents on May 14, 2014. (Doc. #141). The government filed a response to Melcher's motion on March 12, 2015. (Doc. #145). The Court held an evidentiary hearing on May 6, 2015.

**II.**     **RELEVANT FACTS**

On May 14, 2014, FBI Special Agents Marc Silski and Louis Fischetti made an unannounced visit to Melcher's home. At the evidentiary hearing, Fischetti testified that the purpose of this visit was to ascertain whether he and Silski could "flip" Melcher (i.e., convince him to become a witness against Thomas Mackey, the primary target of their investigation). When the agents arrived at Melcher's house, they saw a man walking away from that house. Fischetti asked the man if he was "Joe," but the man answered in the negative, saying that he

"just cut the grass." The man proceeded to get into a car and drive away.

Because the front door of Melcher's house was open, the agents knocked on the screen door and called out for Melcher. When there was no answer, they walked around to the backyard, figuring that he might be there if the landscaper just left. Finding no one, they knocked on the front door again, at which point the next-door neighbor called out to the agents, and they responded that they were looking for Melcher. When advised that he was not home, the agents returned to their vehicle and reviewed Melcher's photograph, determining that the "landscaper" might indeed have been Melcher.

Shortly thereafter, the "landscaper" returned to the scene and pulled up next to the agents in his car, saying that he was Joseph Melcher, and his neighbor had advised him that two men were looking for him. Melcher testified at the hearing that he initially thought the agents were debt collectors, which is why he did not want to speak with them. When Silski and Fischetti produced their credentials and introduced themselves as FBI agents, Melcher invited them inside his house to talk. Melcher testified that although he was nervous, embarrassed and intimidated, he voluntarily invited the agents inside, saying he did so in large part because he did not want his neighbors to see him talking to FBI agents. When asked at the hearing whether he believed he had to talk with the agents, Melcher said yes, simply because they were "federal agents." Fischetti corroborated Melcher's testimony that the agents were voluntarily invited inside the house, saying that no promises or threats were made to gain admission.

Once inside, the two agents and Melcher sat down in Melcher's "front room." Melcher took the seat closest to the front door, which was open and not blocked or obstructed at all. Melcher testified that he was nervous[1] and needed a drink of water; he also politely offered water

---

[1] Fischetti testified that Melcher did not seem nervous when he learned that they were federal

2

to the agents. During the interview, which Melcher estimates lasted no more than 20-30 minutes, the agents inquired about Melcher's relationship with co-defendant Thomas Mackey. According to Fischetti, the conversation was very "lighthearted" and Melcher was "easy-going"; indeed, they discussed their shared interest in playing the guitar and various individuals they both knew through their time in the community.

It is undisputed that, during the course of this questioning, Melcher made a number of admissions to the agents regarding his role in an illegal gambling business.[2] Fischetti testified that, before the agents questioned Melcher, they did not read him his *Miranda* rights, and they did not explicitly advise him that he was "free to leave" and/or did not have to answer their questions. However, they also testified that they did not tell Melcher he had to speak with them, and Melcher was never restrained, placed under arrest, or otherwise prevented from leaving his home. Melcher admits that the agents never displayed or drew their weapons during this brief encounter. Indeed, Melcher – a criminal justice major – testified that the agents were "laid back" during the time they spent with him, and he "didn't think anything of it," and "didn't think it was an interrogation." After completing their interview of Melcher, the agents left his home without arresting him.

Melcher indicated in his motion to suppress that, at the time of the interview in question, he had no prior criminal history and no experience with the police or federal agents. (Doc. #141 at 15). At the evidentiary hearing, however, Melcher admitted that he previously had been arrested twice for alcohol-related driving offenses. On each occasion, Melcher voluntarily

---

agents. Indeed, Fischetti testified that Melcher's demeanor did not change at all.

[2] For example, Melcher admitted that he had found bettors for co-defendant Mackey, and that he would receive 15% of his bettors' losses. He also admitted that he would access his bettors' online accounts to monitor their betting. Most of Melcher's bettors typically bet between $100 and $200 per bet, and Melcher explained that once an account reached $500, he would deliver the money to Mackey.

answered police questions before being provided with a *Miranda* warning. On one of these occasions, however, Melcher refused officers' requests to perform a breathalyzer test.

Melcher now argues that the statements he made to Special Agents Silski and Fischetti should be suppressed because he was not advised of his *Miranda* rights when he was "objectively not free to leave and was therefore in custody." (Doc. #141 at 10).

### III.   ANALYSIS AND CONCLUSION

The Fifth Amendment provides that "[n]o person shall be … compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 458 (1966), the United States Supreme Court held that because custodial interrogations are inherently coercive, certain pre-interrogation warnings are required whenever such custodial interrogations occur. An interview rises to the level of a custodial interrogation when there is a "formal arrest or restraint on freedom of movement," or when an individual is deprived of "freedom of action in any significant way." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *Miranda*, 384 U.S. at 444. Here, the issue before the Court is whether Melcher was in "custody" at the time of his statements to the agents, such that he should have been provided with a *Miranda* warning.

In *Stansbury*, the Supreme Court explained that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323. To determine whether a defendant was in custody such that *Miranda* warnings were required, the court must examine the circumstances surrounding the interview and measure the situation by how a reasonable person being questioned would have "gauge[d] the breadth of his or her freedom of action." *Id.* at 325 (internal quotations omitted). In *United States v. Salvo*, 133 F.3d 943 (6th

Cir. 1998), the Sixth Circuit provided additional guidance on the custody determination, setting forth four factors to be considered in determining whether a defendant was in custody for *Miranda* purposes:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Id.* at 950.

As Melcher recognized in his initial brief, "… several Courts of Appeals have found that when police question a suspect in a residence, these circumstances often do not rise to the kind of custodial situation that necessitates *Miranda* warnings, whether they are free to leave or not." (Doc. #141 at 14-15 (citing *United States v. Howard*, 991 F.2d 195, 200 (5th Cir. 1993) (no custody when questioning occurred at defendant's home and he was told he was not under arrest, although told to "stay put"); *United States v. Gregory*, 891 F.2d 732, 735 (9th Cir. 1989) (no custody when suspect consented to brief interview in home with wife present and agents returned guns to their holsters); *Krantz v. Briggs*, 983 F.2d 961, 962 (9th Cir. 1993), *overruled on other grounds* (*Miranda* warnings not required when officers went to suspect's girlfriend's home and suspect voluntarily invited them inside and agreed to talk); *Devier v. Zant*, 3 F.3d 1445, 1458 (11th Cir. 1993) (*Miranda* warnings not required when defendant questioned at home without *Miranda* warnings and then volunteered to continue questioning at station)). Indeed, the Sixth Circuit has recognized that interviews that occur within an individual's home rarely rise to the level of custodial interrogations; this is because a person generally feels most comfortable in his own home and usually commands a sense of control over what goes on within it. *See United*

*States v. Panak*, 552 F.3d 462, 465-66 (6th Cir. 2008).

Applying these principles to the instant case, the Court is persuaded that Special Agents Silski and Fischetti acted properly in speaking to Melcher without first administering *Miranda* warnings, as Melcher was not in custody during this encounter. Crucially, the agents met with Melcher *at his home*, which courts have consistently held rarely – if ever – rises to the level of a coercive environment. *See, e.g., United States v. Reynolds*, 2013 WL 2417940, at *5 (E.D. Mich. June 3, 2013) ("Generally, questioning occurring in a defendant's home does not present a police coercive environment and therefore does not rise to the kind of custodial situation that necessitates *Miranda* warnings."); *United States v. Gillman*, 432 F. App'x 513, 516 (6th Cir. 2011) ("An in-home encounter between police and a citizen is generally non-custodial.") Moreover, the agents' discussion with Melcher was "admittedly brief" (Doc. #141 at 16), lasting no more than twenty or thirty minutes. And, Fischetti testified that the primary purpose of their questioning was to delve into Melcher's relationship with Mackey, not to ascertain Melcher's own personal criminal conduct.

The "other indicia of custody" also weigh in favor of a finding that Melcher was not in custody. Although he initially evaded the agents by identifying himself as the "landscaper," Melcher later voluntarily returned to his home to speak with them. He then invited them inside his home to talk (and even offered them a glass of water). Melcher admitted that the agents were "laid back" and that he did not consider their questioning to be "an interrogation." At no point was Melcher told he could not leave; indeed, he was in the seat closest to the door (which was open) during the discussion, and his freedom of movement was not restricted in any way. Although Melcher believed the agents were armed, he admits that they never displayed or drew their weapons and that he was not handcuffed or otherwise restrained in any way. At the end of

6

the discussion, the agents left without arresting Melcher. Moreover, Melcher, a criminal justice major, had a history of voluntarily answering police questions in far more coercive situations (and, on the flip side, had refused police requests when he believed it appropriate). Given these facts, the Court concludes that Melcher was not in custody, and, therefore, the agents were not required to advise him of his *Miranda* rights. *See Reynolds*, 2013 WL 2417940, at *5; *Gillman*, 432 F. App'x at 516.

In arguing to the contrary, Melcher asserts that he felt "intimidated," that he felt he was not free to leave, and that he believed he had to answer the agents' questions because "they were federal agents." As the government points out in its response to Melcher's motion, however, these subjective impressions and feelings cannot form the basis for suppression. The Supreme Court has emphasized that the determination of custody under *Miranda* "depends on the *objective* circumstances of the interrogation, not on the *subjective* views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323 (emphasis added); *see also Biros v. Bagley*, 422 F.3d 379, 389 (6th Cir. 2005). Moreover, because the interview occurred in Melcher's home, the fact that neither agent explicitly told him he was free to leave is not determinative; as courts have recognized, in such circumstances, the appropriate inquiry is not whether the suspect feels he can leave but, rather, whether the police will terminate questioning if asked to leave. *See United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004); *Salvo*, 133 F.3d at 950. Here, there was nothing the agents did or said that indicated they would not stop questioning Melcher if he asked them to leave.

In sum, having assessed the totality of the circumstances, the Court concludes that Special Agent Silski and Fischetti's questioning of Melcher on May 14, 2014, did not constitute a custodial interrogation. Thus, Melcher's statements to them should not be suppressed.

**IV.     RECOMMENDATION**

For the reasons set forth above, **IT IS RECOMMENDED** that Melcher's Motion to Suppress (**Doc. #141**) be **DENIED**.

Dated: May 27, 2015                                              s/ David R. Grand
                                                                                    DAVID R. GRAND
                                                                                    UNITED STATES MAGISTRATE JUDGE


**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  See *Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  See *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  See E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  See Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 27, 2015.

                                      s/Eddrey O. Butts
                                      EDDREY O. BUTTS
                                      Case Manager